IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:20-CR-10-FL-1

UNITED STATES OF AMERICA, )
)
v. )
) ORDER
EARL LAMONT VAUGHAN, )
)
Defendant. )

This matter is before the court on defendant's motion to suppress certain evidence and statements allegedly obtained in violation of the Fourth and Fifth Amendment to the United States Constitution. (DE 27). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge Robert T. Numbers, II, entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motion be denied. (DE 43). Defendant timely filed objections, and the government responded. In this posture, the issues raised are ripe for ruling. For the following reasons, the court adopts the M&R and denies the motion.

**STATEMENT OF THE CASE**

Indictment filed March 12, 2020, charges defendant with: 1) possession with intent to distribute a quantity of fentanyl, a Schedule II controlled substance; 2) possession of a firearm in furtherance of a drug trafficking crime; and 3) possession of a firearm by a felon. Defendant filed the instant motion on April 27, 2021, seeking to suppress his statements to police made on April 2, 2019, and all evidence seized that same day from his vehicle and at a residence at 442 Benthall Bridge Rd., Murfreesboro, North Carolina ("the residence"). In support, defendant relies upon

exhibits comprising an emergency medical services (EMS) report from the date of his arrest; reports of arresting agent Chase Oliver ("Oliver"), an investigator assigned to the Down East Drug Task Force, and police chief David Griffith ("Griffith"); and Oliver's probable cause affidavit. The government responded in opposition, and the magistrate judge held an evidentiary hearing on the motion on June 8, 2021, and continuing on June 18, 2021.

At hearing, defendant introduced testimony of William Liverman ("Liverman"), chief deputy in the Hertford County Sheriff's Office; Karen Umstead, investigator with the federal public defender's office; and Oliver. In addition, the court admitted the following exhibits introduced by defendant: pictures of defendant's bedroom, the residence more generally, and evidence at the scene; Oliver's use of force report; the use of force policy in place at the Hertford County Sheriff's Office at the time of the incident; a recording of Oliver's 911 call; and the grand jury testimony from defendant's indictment.

The government for its part introduced additional testimony from Oliver; Martin Phelps ("Phelps"), a law enforcement officer assigned to the Down East Drug Task Force; Griffith; Glenda Holley ("Holley"), defendant's aunt; William Keith Lassiter, an officer with the Hertford County Sheriff's office; and Kimberly Sledge ("Sledge"), formerly an emergency medical technician ("EMT") for Hertford County Emergency Services. The government offered and the court admitted an exhibit comprising a picture of a set of scales with brown residue taken at the residence.

On September 13, 2021, the magistrate judge entered the instant M&R, after which defendant timely filed objections and the government responded.

**STATEMENT OF FACTS**

The court incorporates by reference as if fully set forth that "Background" section of the M&R, where the proposed findings are supported by the testimony and evidence received at evidentiary hearing. (M&R (DE 43) at 1–8).[1] The court addresses specific objections raised by defendant to factual findings in the M&R in the analysis.

**COURT'S DISCUSSION**

A.   Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.   Analysis

In the instant motion to suppress, defendant asserts that officers violated his Fifth Amendment rights by first failing to provide defendant with warnings pursuant Miranda v. Arizona, 384 U.S. 436 (1966) and its progeny when they questioned him in Oliver's patrol car and,

---

[1]      Page numbers in citations to documents in the record specify the page number designated by the court's electronic case filing (ECF) system, and not the page number, if any, showing on the face of the underlying document.

3

second, by failing to obtain a voluntary waiver of those rights in a subsequent interrogation at the station. Defendant additionally contends officers conducted a warrantless search of his car and residence in violation of the Fourth Amendment, and that the subsequently obtained warrant to search the residence lacked probable cause. The magistrate judge cogently and thoroughly determined in the M&R that defendant's arguments are without merit. Upon de novo review, the court finds the determination by the magistrate judge to be correct, and the court adopts and incorporates herein by reference the M&R. (See M&R (DE 43)). The court writes separately to address defendant's specific objections.[2]

1. Witness Credibility

Defendant objects to the magistrate judge's determination that Oliver is a credible witness.[3] Upon reaching that determination, the magistrate judge noted Oliver's "testimony was consistent with [Phelps' testimony], the documentary evidence, and the testimony of other witnesses. When [Oliver] testified, [he] did so in a manner that was matter-of-fact and not adversarial in tone." (Id. at 10). Moreover, the magistrate judge remarked that "the level of detail of [his] testimony supports [his] credibility." (Id.).

In objecting to this finding, defendant contends there are numerous inconsistencies between "the officers' version[s] of events" and, as an example, points to reports by Oliver and

---

[2]     In defendant's original motion he sought a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) in the alternative to his request that the evidence be suppressed. The magistrate judge denied that request, and defendant does not raise a specific objection to that denial. Accordingly, upon careful review of the M&R and of the record generally, having found no clear error, the court hereby adopts the recommendation of the magistrate judge as its own, and, for the reasons stated therein, defendant's motion for a Franks hearing is denied. (See M&R (DE 43) 28–30).

[3]     The M&R thoroughly addresses the credibility of both Oliver and Phelps. Though defendant now objects to the "officers' version of events" in the plural, he provides specific evidence bearing only on Oliver's credibility. (Def. Obj. (DE 46) at 2). As to Phelps, defendant makes the general and conclusory objection that his testimony was "not credible" and "implausible." (Id. at 2, 3). Accordingly, upon careful review of the M&R and of the record generally, having found no clear error, the court hereby adopts the magistrate judge's credibility judgment of Phelps as its own. (See M&R (DE 43) 9–14). The remainder of this section reviews the magistrate judge's credibility determination of Oliver de novo.

4

Griffith, which allegedly "differ on critical points." (Def. Obj. (DE 46) at 2). Griffith states in his report, which he wrote seven months after the incident took place, "[n]o-one went back to the backroom or any other section of the house until [Oliver] came back with the warrant." (Id.). Defendant contends that contradicts Oliver's incident report in which he admitted to searching the residence, including defendant's bedroom located in the back, before obtaining a search warrant. (Id.). Far from a "stark contradiction," however, Griffith's testimony at the hearing on this motion revealed the inconsistency to be a mere product of Griffith's temporary departure from the residence during the period in which Oliver conducted his initial search. (Id.; Tr. (DE 41) at 94–95 (testifying that Oliver's inspection likely occurred while Griffith remained outside with defendant for several minutes)).

Defendant next asserts that Oliver "admitted that he only decided to arrest [defendant] for driving with a revoked license after [defendant] voiced objections to the search of the trailer," which defendant contends amounts to arresting him "for attempting to exercise his constitutional rights." (Def. Obj. (DE 46) at 2). In apparent rebuke of Oliver's general approach "to law enforcement and the due process rights of the citizens he encounters," defendant further contends Oliver "beat [defendant] and placed him in a carotid hold (without later reporting that hold to his supervisors, in violation of policy)" and further told defendant that he would "put [him] to sleep." (Id. at 2–3).

Though Oliver did testify that he and Phelps did not arrest defendant for the revoked license until after he protested their search of the residence, Phelps testified that their decision was based on defendant's nervous behavior which he believed indicated a risk of flight. (See Tr. (DE 41) at 76 (Phelps testifying that defendant began "looking towards the front door . . . . [m]aybe an escape route, that he wanted to leave.")). His testimony thus credibly reveals a tactical decision rather

than a bare attempt to hinder defendant's exercise of his constitutional rights. As to Oliver "beat[ing]" defendant, Oliver and Phelps both testified credibly that defendant violently resisted arrest, and the ensuing fight was a product of that resistance. (See Tr. (DE 41) at 17 ("Phelps was using the word 'please' several times because, I mean, we were—we were [sic] give out. [Defendant] was a big guy. He was throwing us like we was rag dolls till we got to where the love seat was at.")). Griffith in fact testified that, at least for a moment, defendant appeared to have gotten the better of Oliver and Phelps. (See id. at 37 (describing defendant as being in "better" condition and Oliver and Phelps being "more tired than [defendant] was")). Oliver further testified that he was not threatening defendant when he told him he would "put him to sleep," but rather was trying to warn defendant that if he continued resisting, Oliver would resort to a carotid hold. (See id. at 15; id. at 69 (Oliver testifying that defendant "was fighting so bad, we were getting so tired, I slid down and put him in a carotid hold")).

Finally, though the record reflects that Oliver failed to report he used a carotid hold on defendant and that failure was in contravention of established policy, there is no evidence indicating the omission was motivated by malintent. Based on the record, there was in fact little incentive to intentionally omit the information. Oliver testified, and Liverman confirmed, that use of the carotid hold in this instance was in accordance with the department's use of force policy. (Id. at 70–71 (Oliver testifying to that effect); see also Tr. (DE 42) at 14 (Liverman testifying that Oliver "didn't violate policy by using the carotid hold")). Rather, Oliver testified that he failed to report the hold because he "forgot" the reporting policy required it where he only held the hold for several seconds and defendant did not become unconscious. (Tr. (DE 41) at 36–37). As stated in the M&R, "while [Oliver's] lack of knowledge about the reporting requirement is not commendable, it does not materially impact his credibility." (M&R (DE 43) at 12).

Upon de novo review, having found no inconsistencies in Oliver's testimony, and where the record and evidence presented at hearing otherwise supports the magistrate judge's credibility determination, the court adopts the magistrate judge's finding that Oliver was a credible witness.

### 2. Statements Made to Law Enforcement

Defendant objects to the M&R's conclusions that his Fifth Amendment rights were neither violated when Oliver questioned defendant in a patrol car without providing Miranda warnings, nor were they violated when Oliver and Phelps interviewed defendant at the police station following his arrest. The court addresses these incidents in turn below.

### a. Non-Mirandized Statements Inside Patrol Car

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. VI. "As a prophylactic safeguard for this constitutional guarantee, the Supreme Court has required law enforcement to inform individuals who are in custody of their Fifth Amendment rights prior to interrogation." United States v. Hashime, 734 F.3d 278, 282 (4th Cir. 2013). If officials fail to provide these so-called Miranda warnings where required, evidence obtained as a result will generally be inadmissible. Id.

"When deciding whether a defendant not under formal arrest was in custody—and thus if the Miranda requirements apply—a court asks whether, under the totality of the circumstances, a suspect's freedom of action [was] curtailed to a degree associated with formal arrest." Id. This inquiry is an objective one that considers whether a reasonable person would have felt that they were at liberty to terminate the interrogation and leave. Id. at 282–83.

The M&R found that Oliver's questioning of defendant inside Oliver's patrol car was not custodial, and consequently defendant was not entitled to Miranda warnings. Defendant objects

to that finding, contending Oliver and Phelps were armed and "outnumbered [defendant] two to one." (Def. Obj. (DE 46) at 8). They "separated [defendant] from his home, away from his aunt, and directed him to sit in their patrol vehicle, which was parked behind [defendant's] car." (Id.). Further, Oliver specifically testified that he directed defendant to sit in the car as it was "a more secure location," and thereby revealed an intent to control defendant's movements. (Id.).

While the record reflects that defendant's freedom of movement was curtailed during this initial questioning, it was not limited to the extent associated with a formal arrest. The encounter began when Oliver and Phelps knocked on the door of the residence. (Tr. (DE 41) at 9). Though Oliver and Phelps did not know it at the time, defendant spent substantial time in the residence and indeed maintained a bedroom there. (Id. at 116 (Holley testifying that defendant went to the residence almost daily, sometimes with his daughter and her mother, and had his own set of keys and bedroom)); see Hashime, 734 F.3d at 284 (noting "courts are generally less likely to characterize as custodial interrogations in familiar settings like the home"). Defendant did not answer the officers' knock for "several minutes," thus initiating the interaction on his own terms, and the officers remained waiting outside. (Tr. (DE 41) at 9, 74).

Once defendant did answer the door, he opened it to find only two officers. Cf. Hashime, 734 F.3d at 284 (finding an interrogation custodial where the defendant's "house was occupied by a flood of armed officers"); United States v. Colonna, 511 F.3d 431, 436 (4th Cir. 2007) (same where "the house was inundated with over twenty-three FBI agents"). The record further reflects that those officers framed their initial communications with defendant as requests rather than directives. See Hashime, 734 F.3d at 283 (listing the words used by the officer as well as their tone of voice and general demeanor as relevant factors to the custody determination). As it was raining at the time, officers initially asked to step inside the home. (Tr. (DE 41) at 9). However,

8

observing that defendant seemed "really nervous," they changed course and Oliver asked defendant if he would step back to their unmarked patrol vehicle. (Id.). The record shows that defendant then walked to the vehicle of his own accord, sat in the front passenger seat, and shut the door. (Id. at 56). And though Oliver testified that he suggested the car for the sake of officer-safety, officer intent "has no bearing on the question whether a suspect was 'in custody' at a particular time." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). Finally, at no point during this initial interaction was defendant told that he was detained, nor did the officers draw their weapons, handcuff defendant, or otherwise tell defendant that he was not free to decline the invitation to speak. Indeed, the only evidence defendant offers to show Oliver and Phelps were armed at the time is Oliver's testimony to the effect that "they were on patrol." (Def. Obj. (DE 46) at 8 n.5).

Thus, upon de novo review and based on the totality circumstances, this court finds defendant was not in custody when Oliver initially questioned him in the patrol car. As he consequently was not entitled to Miranda warnings, Oliver's failure to provide them has no bearing on the admissibility of defendant's statements.[4]

   b.   Mirandized Statements at Police Station

Turning to defendant's next objection, defendant contends his later waiver of his Miranda rights following his arrest was not voluntary.

 Once officials provide a suspect with his Miranda warnings, the suspect may waive effectuation of the underlying rights "provided the waiver is made voluntarily, knowingly and

---

[4]      As noted in the M&R, neither the Supreme Court nor the Fourth Circuit have yet decided who bears the burden of establishing that the defendant was in custody and thus entitled to Miranda warnings. Several courts have held that the defendant bears the burden, see United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989); United States v. Davis, 792 F.2d 1299, 1309 (5th Cir. 1986), while still others have resorted to a burden shifting framework, see, e.g., United States v. Freeman, 61 F. Supp. 3d 534, 536 (E.D. Va. 2014). The court need not decide this issue here because the court finds that, regardless of which party bears the burden of proof, the totality of the circumstances demonstrates that defendant was not in custody at the time of the interrogation.

9

intelligently." Miranda, 384 U.S. at 444. The government bears the burden of establishing that the waiver was both voluntary and "knowing[] and intelligent[]" by a preponderance of the evidence. See J.D.B. v. North Carolina, 564 U.S. 261, 269–70 (2011).

The test for determining whether a statement was involuntary is "whether the defendant's will [was] overborne or his capacity for self-determination critically impaired because of coercive police conduct." United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (providing courts should "engage in the same inquiry when analyzing the voluntariness of a Miranda waiver as when analyzing the voluntariness of statements under the Due Process Clause"). While "courts must consider the totality of the circumstances" when making this inquiry, "coercive police activity is . . . a necessary predicate to a finding that a waiver of Miranda rights [was] not voluntary." Id. at 140–141.

In defendant's original motion, he contended that his fight with Oliver and Phelps deprived him of the ability to voluntarily waive his Miranda rights several hours later when he was questioned at the station. (Def. Mem. (DE 27) at 15). In the M&R, the magistrate judge rejected that argument, reasoning largely by analogy with the Fourth Circuit's analysis in Cristobal. (See M&R (DE 43) 18–21); Cristobal, 293 F.3d 134. Defendant now objects to that reliance, contending Cristobal "is unhelpful." (Def. Obj. (DE 46) at 9).

On de novo review, this court finds that Cristobal does indeed shed light here. There, the defendant similarly contended that his diminished mental state rendered his Miranda waiver involuntary. Cristobal, 293 F.3d at 139. In addressing that claim, the Fourth Circuit held that while it is appropriate to take defendant's mental state into account, the "ultimate[] focus" is on "the actions of law enforcement officials" and whether they "exploited [the defendant's] weakened condition with coercive tactics." Id. at 141. Applying that same analysis here, this court first

10

identifies defendant's mental state, and then turns to the ultimate question of whether Oliver and Phelps exploited any deficit with coercive tactics. In both inquiries, Cristobal offers guidance.

As to mental state, the officers in Cristobal shot the defendant multiple times, including in the "upper chest." 293 F.3d at 138. The following morning, after defendant underwent emergency surgery, was placed in "soft restraints," and provided pain killers and narcotics, agents interrogated him. Id. at 138, 140. The court held these facts alone did not automatically render the defendant's subsequent waiver involuntary. Id. at 141.

By comparison, here defendant engaged in a hand-to-hand fight with two agents that ended with him pinned down. (See Tr. (DE 41) at 14–15 (Oliver reporting that he was in a "fight" with defendant in which he delivered "some quick strikes to the back of [defendant's] head" and placed defendant in a headlock); Tr. (DE 41) at 96 (Griffith testifying that he found defendant and officers in a "kind of dog pile")). There is no evidence on the record indicating that a weapon was drawn at any point during the altercation. (See id. at 17, 37). The record shows that Oliver placed defendant in a carotid hold at one point during the fight, the ultimate purpose of which is to render a person unconscious. (Id. at 70). However, Oliver testified that he let go of the hold after several seconds and defendant was never unconscious. (Id. at 36–37). That account was corroborated by Sledge, the EMT who acted as the lead on defendant's medical examination following the altercation. Sledge testified that defendant complained only of hand pain, that he was alert and oriented, and showed no other symptoms indicating any issue beyond cuts to his hands.[5] (See Tr. (DE 41) at 130 ("He could answer my questions. He knew who he was, where he was, the events

---

[5] The medical report stated that defendant suffered "suffocation or asphyxia" as well as "acute bronchospasm," however Sledge testified that those observations were reported in error. (See Tr. (DE 41) at 133). Indeed, the simple fact that Sledge was the lead on defendant's call rather than her partner for the afternoon, who was the advanced life support technician while Sledge was the "basic" on the unit, indicates the report is in error. (Id. at 129–30). Defendant does not contest that clarification in his objections, and thus this court takes Sledge's clarification as true.

that were taking place during the day."); see also id. at 44 (Oliver testifying that though he requested EMS, he explicitly provided that that there is "no 10-18," meaning it was not an emergency)). Thus, as compared to the defendant in Cristobal, to the extent defendant suffered from a medical condition, the record indicates it was not severe.

Turning, then, to whether Oliver and Phelps exploited whatever vulnerabilities existed with coercive tactics, in Cristobal the court found it significant that the defendant never requested to terminate the interview and no officer pressured the defendant to waive his rights and answer the agent's questions. 293 F.3d at 141. The court further noted that the agent who conducted the interview checked with a nurse to confirm the defendant was mentally and physically capable of being interviewed, read defendant his Miranda rights, and otherwise made sure the defendant was a willing participant in the interview. Id. Based on these findings, the court determined the agents did not engage in coercive tactics, and thus the defendant's waiver was voluntary. Id.

Applied here, there is similarly no evidence in the record that defendant requested to terminate the interview at the station. It is uncontested that officers provided defendant with his Miranda rights, and there no indication that Oliver or Phelps pressured defendant to waive them. Additionally, while the record does not show that Oliver or Phelps actively confirmed with a medical professional that defendant was mentally and physically capable of being interviewed, they did call EMS and provided defendant the opportunity to be evaluated. (See Tr. (DE 41) at 44). During that evaluation, defendant was offered the option of going to the hospital, which he refused. (Id. at 131 (Sledge testifying that EMTs are required to provide the option of going to the hospital when they respond to a call)). Further, the interview took place several hours after the altercation, and there is no evidence in the record indicating that defendant was at that time or any other exhibiting signs that his mental faculties were affected. Oliver in fact testified to the contrary,

that defendant was "calm and collected" during the interview and did not mention the altercation. (Id. at 23). Thus, particularly in light of Cristobal, the record does not support a finding of coercive tactics by officers Oliver and Phelps, and it consequently does not support a determination that defendant's waiver was involuntary.

Defendant's arguments to the contrary are ineffectual. Defendant tries to distinguish Cristobal on the grounds that defendant "was not interviewed in a hospital, but in the far more coercive and intimidating environment of a jail." (Def. Obj. (DE 46) at 9). Further, he "was interviewed by the very same deputies who, only hours earlier, had beaten and choked him." (Id.). Yet neither of these two facts shed light on defendant's mental state nor, more importantly, are they indicative of coercive tactics. The record reflects that Oliver and Phelps interviewed defendant in a law library. (See Tr. (DE 41) at 23). A law library is not inherently coercive, and indeed it is considerably less coercive than interrogating a suspect while he is constrained to a hospital bed as occurred in Cristobal. See 293 F.3d at 138. As to the fact that Oliver and Phelps were the same officers who engaged in the altercation, that alone is not coercive, and there is no indication in the record that Oliver or Phelps threatened similar conduct or otherwise used that experience to their tactical advantage.

Thus, upon de novo review of the record, this court finds that defendant's will was not overborne by the circumstances of his interrogation and that his waiver was voluntary. Miranda therefore does not serve as a bar to the admission of his testimony.

3.      Evidence Seized

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant

13

issued by an independent judicial officer." United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004). "[S]earches conducted outside the judicial process . . . are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

Here, defendant objects to the M&R's finding that the warrantless search of both his car and the residence were constitutionally permissible pursuant valid consent. Defendant also objects to the M&R's finding that the subsequently issued warrant to search the residence was supported by probable cause.

    a.    Warrantless Search of Defendant's Car

"[A] search conducted pursuant to a valid consent is constitutionally permissible" where "the consent was, in fact, freely and voluntarily given." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).

Defendant's objection to the search of his car is one of fact. He does not raise the question of voluntariness, but rather asserts that he provided no consent whatsoever. (Def. Obj. (DE 46) at 6). In support, defendant points to the fact that while officers obtained written consent from Holley to search the residence, there is no evidence they similarly obtained written consent to search defendant's car. (Id. at 7). According to defendant, "[t]he lack of written consent undermines the officer's testimony" that defendant consented to the search of his car. (Id.).

While it may be good practice to obtain written consent, oral consent nevertheless provides a proper basis for a warrantless search. See, e.g., United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996) (finding search of an automobile proper pursuant oral consent and further holding that a refusal to subsequently execute a written consent form does not act as an effective withdrawal of that oral consent). Nor does defendant point to any authority providing otherwise. Consequently,

Oliver and Phelps' failure to obtain defendant's written consent does not undermine their otherwise credible testimony to the effect that defendant consented to the search of his car. (See Tr. (DE 41) at 11 (Oliver testifying that defendant affirmatively asserted, "[y]ou can search my car, you can search my car"); Tr. (DE 41) at 89 (Phelps testifying that Oliver rolled down the patrol car window and told him defendant consented to a search of his car at a volume defendant could hear and defendant did not object)).

Thus, upon de novo review, having found the record supports the magistrate judge's determination that defendant voluntarily consented to the search of his car, the court adopts the magistrate judge's finding that officers did not violate defendant's Fourth Amendment rights in so searching.

   b.  Warrantless Search of Residence

Turning then to the officers' warrantless search of the residence, defendant contends that as a co-occupant present and objecting at the time of the search of the residence, his own objections negated Holley's consent.

A warrantless search pursuant consent is valid where consent is given by someone with real or apparent authority to consent. See United States v. Matlock, 415 U.S. 164, 171 (1974). Apparent authority exists where the consenting person appears to "possess[] common authority over or other sufficient relationship to the premises or effects sought to be inspected." Id. "As long as the facts available to the officer at the moment . . . warrant a [person] of reasonable caution in the belief that the consenting party had authority, apparent authority to consent exists, and evidence seized or searched pursuant to that consent need not be suppressed." United States v. Buckner, 473 F.3d 551, 555 (4th Cir. 2007).

If one co-occupant consents to a search while another is physically present and objecting, however, law enforcement officers do not have reasonable grounds to believe that they can search the premises. <u>Georgia v. Randolph</u>, 547 U.S. 103, 107 (2006). Notably, as this exception to the general permissibility of search pursuant to a co-tenant's consent is based in "widely shared social expectations," particularly that "there is no societal . . . understanding of superior and inferior as between co-tenants," it is limited to those who reasonably appear to be co-tenants. <u>See</u> <u>id.</u> at 111.

Here, defendant objects to the M&R's finding that Oliver and Phelps did not have reason to believe defendant was a co-tenant at the residence. In support, defendant points to Oliver's testimony that he and Phelps were in the area, looking for defendant, "precisely because different sources told them that [defendant's] residence was a single-wide trailer close to a cotton gin . . . close to [sic] on Benthall Bridge Road." (Def. Obj. (DE 46) at 4). These same sources also described defendant's car. (<u>Id.</u>). Defendant contends that subsequently finding defendant in a car next to a property matching those descriptions should have alerted Oliver and Phelps to the fact that they were at defendant's residence. (<u>Id.</u>). According to defendant, a reasonable person then would have corroborated that belief by observing defendant's actions, including parking and entering the home freely and answering the door himself when Oliver and Phelps knocked. (<u>Id.</u> at 4–5).

The record, however, indicates Oliver and Phelps had successfully identified several addresses associated with defendant prior to their run-in, and the residence was not one of them. (Tr. (DE 41) at 7). Further, to the extent they nevertheless should have inferred the possibility that the residence belonged to defendant, that prospect was quickly dispelled by defendant himself. The record reflects that defendant repeatedly told officers the residence belonged to his aunt. (<u>See, e.g.</u>, <u>id.</u> at 10, 11, 19, 52, 56). Most notably, Oliver testified that in providing consent to search

his car, defendant stated: "you can search my car. This is my aunt's house." (Id. at 11). A reasonable person could understand those juxtaposed statements to create a distinction between the car and the residence. Namely, while officers could search defendant's car with his consent, defendant was not at liberty to provide the same as to the residence.

The décor of the residence and Holley's statements lent further support to that understanding. Officers testified that, based on the interior furnishings, "it appeared that an elderly lady lived [at the residence]." (Id. at 75). Indeed, prior to the discovery of defendant's bedroom, there was nothing indicating a younger male might live there. (Id. at 75). Holley further stated during their conversation that she wanted the drugs out of "my" house, thereby indicating sole tenancy. (Id. at 12). Even defendant's alleged objections could reasonably be understood to confirm his "inferior" status as compared to Holley. Randolph, 547 U.S. at 104; see id. at 113. Namely, Oliver testified that rather than directly instructing officers not to search the property, defendant told Holley not to allow the officers to search it, thereby deferring to her authority. (See Tr. (DE 41) at 13).

Based on these observations, Oliver and Phelps reasonably suspected that the residence belonged to Holley and defendant used it as a "stash house" in which he hid his drugs but did not reside. (Id. at 126). Defendant's apparent ability to freely park and enter the residence is by no means inconsistent with that interpretation, but rather is in line with "widely shared social expectations" where the residence belonged to his elderly aunt. See Randolph, 547 U.S. at 111. Thus, even assuming defendant adequately objected to the search of the residence, officers still had reasonable grounds to believe they could search it pursuant to Holley's consent.

Defendant's arguments to the contrary are unavailing. Defendant contends that his statements to officers that the residence belonged to his aunt did not "negate his status as co-tenant"

17

for defendant "did not claim . . . that he did not also live there." (Def. Obj. (DE 46) at 5). Similarly, Holley's statement that she wanted the drugs out of her house did not mean that the residence could not also belong to defendant. (Id.). While it is true that these statements can co-exist with a reality in which defendant was a co-tenant at the residence, that is not the relevant inquiry. Officers are not required to dispel all possibilities of common authority prior to acting on the consent of a tenant. Rather, where someone objects to a tenant's consent the question is whether, based on the facts available at the time, an officer would be reasonable in his belief that the objecting party was not a co-tenant of the property to be searched. See Buckner, 473 F.3d at 555. Here, the record so reflects.

Defendant further points to Holley's testimony that, prior to his entry, she told Oliver a room at the residence was defendant's room and further informed Oliver that defendant "had a key to his padlock." (Tr. (DE 41) at 119). Obviously, if that testimony were to be credited, then no reasonable officer at that point could conclude that defendant was not a co-tenant. However, on review of the record, Holley provided on multiple occasions that she had difficulty remembering the details of the day given the amount of time that had elapsed. (See, e.g., Tr. (DE 41) at 104 (testifying that "it's been so many years" and "it's been a while" when asked if she told officers to get the drugs out); id. at 115 (testifying that she didn't know and that it was "two years ago" when asked whether defendant told her officers needed a search warrant)). Holley's testimony was also occasionally inconsistent, as it was directly after she testified that she told officers the bedroom belonged to defendant. Specifically, Holley testified that she did not discuss the padlock on defendant's bedroom with officers or how defendant kept it locked, and then immediately thereafter provided that she did tell officers that defendant had the keys to that same lock. (See id. at 119). Following which, she stated "[e]verything's—the things—remote. . . . I don't know. It's

been so long." (Id.). Given these lapses, there is good reason to doubt the accuracy of Holley's testimony. Consequently, particularly as it conflicts with the more credible testimony of Oliver and Phelps, this court declines to credit it.

Thus, Oliver and Phelps' initial warrantless search of the residence, including defendant's bedroom, was lawful pursuant Holley's valid consent.[6]

   c.  Search of Residence Pursuant to a Warrant

Once Oliver suspected he was in defendant's bedroom, he left and successfully applied for a search warrant. Defendant objects to the M&R's finding that the contents of Oliver's affidavit, submitted with the warrant application, established probable cause to search the residence. (Def's Obj. (DE 46) at 9).

To be valid, a search warrant must "contain a particular description of the place to be searched, and the persons or things to be seized" and "be based upon probable cause, supported by Oath or affirmation." United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994). When reviewing a magistrate's probable cause determination, "[the court's] inquiry is directed to whether the magistrate had a substantial basis for his conclusion that probable cause existed." United States v. Williams, 974 F.2d 480, 481 (4th Cir. 1992). In conducting this inquiry, "[the court] must accord great deference to the magistrate's assessment of the facts presented to him." United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990).

Here, Oliver provided in his affidavit that probable cause to search the residence existed based on several complaints of drug activity at its address from both concerned citizens and members of law enforcement; Oliver's own familiarity with defendant and defendant's

---

[6]  Defendant additionally objects to the M&R's finding that he did not adequately object to Holley's consent to search. (Def's Obj. (DE 46) at 5–6). As the issue is resolved on finding the officers did not have reason to believe he was a co-tenant at the time of his alleged objection, this court declines to consider that additional objection.

involvement in the sale of narcotics; and, finally, the set of digital scales with brown powder residue Oliver observed while he was in defendant's room. (Def's Exhibit 1 (DE 32-7) at 5). Based on his years of experience, Oliver believed the powder to be heroin. (Id.). The M&R found that Oliver's observation of the digital scale with powder residue together with his familiarity with defendant provided a substantial basis for a magistrate to believe there was probable cause to search the residence. (M&R (DE 43) 27–28). Defendant objects to that finding, contending that Oliver's observation of the digital scales was the product of an unlawful search. (Def's Obj. (DE 46) at 9). Absent that information, defendant asserts the remaining sources are insufficient to support a finding of probable cause to search the residence. (Id.).

Fairly construed, defendant argues that, as the issuing magistrate judge relied at least in part on information he alleges was impermissibly acquired, the evidence obtained as a product of the subsequently issued warrant was "fruit of the poisonous tree" and thus must be suppressed. See United States v. Apple, 915 F.2d 899, 910 (4th Cir. 1990). However, as already explained above, Oliver's warrantless entrance into defendant's room was permissible pursuant Holley's consent, and consequently his subsequent observation of the digital scales with brown residue was not the fruit of an unlawful search.

Thus, upon de novo review, this court finds the evidence of the digital scales was permissibly considered in the M&R's probable cause determination.[7]

---

[7] Defendant does not further object to the M&R's finding that with this evidence fairly considered, there was a substantial basis for the issuing magistrate judge to conclude probable cause existed. Accordingly, upon careful review of the M&R and of the record generally, having found no clear error, the court hereby adopts the magistrate judge's judgment that a substantial basis existed as its own. (See M&R (DE 43) 26–28).

**CONCLUSION**

Based on the foregoing, upon careful review of defendant's objections and the record in this case, the court ADOPTS the M&R (DE 43) and DENIES defendant's motion to suppress (DE 27).

SO ORDERED, this the 18th day of January, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge